



FILED

Mar 20 2024, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Timothy L. Hall, Jr.,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

March 20, 2024

Court of Appeals Case No.
22A-CR-3007

Appeal from the Allen Superior Court

The Honorable David M. Zent, Judge

Trial Court Cause No.
02D06-2006-MR-000019

---

**Opinion by Judge Felix**
Judges Pyle and Kenworthy concur.

**Felix, Judge.**

## Statement of the Case[1]

[1] On June 13, 2020, Timothy L. Hall, Jr. was attending a birthday party with his toddler son at the home of Hall's sister and her fiancé, Manuel Mendez, in Fort Wayne. Mendez and Hall argued, and Hall shot Mendez 18 times, killing him, before Hall fled in his car with his son. A jury found Hall guilty of murder, criminal recklessness, resisting law enforcement, and neglect of a dependent. Hall now appeals his convictions and sentence, raising three issues for review:

1. Whether the trial court erred when it refused to allow him to "fully" impeach a witness;
2. Whether the State presented sufficient evidence to rebut Hall's self-defense claim; and
3. Whether his sentence is inappropriate considering the nature of his offenses and his character.

We affirm.

## Facts and Procedural History

[2] On June 13, 2020, Hall and his two-year-old child arrived at a birthday party hosted at 2136 Gilmore Drive in Fort Wayne, the home his sister, Kayla Cyrus ("Sister"), shared with her fiancé, Manuel Mendez, and their children. Hall

---

[1] We heard oral argument in this case on February 9, 2024, at Frankton Junior/Senior High School in Frankton. We thank the students, administration, faculty, and staff of the school for their hospitality and assistance. We would also like to thank counsel for the high quality of their oral presentations.

noticed that his sister had a black eye. When Hall asked her about it, she said nothing had happened, but Hall believed Mendez had caused the black eye.

[3] Hall consumed alcohol during the party. Sister testified Hall was being "loud, obnoxious, joking around," "fell down a few times," and was "very intoxicated." Tr. Vol. II at 65. Others at the party observed him "falling backwards onto the ground" because he couldn't stand up, *id.* at 120, and "rolling around on the ground," *id.* at 89.

[4] Mendez arrived home from work around midnight, while people were still gathered at the home. Sometime thereafter, while Mendez was in the house, Hall attempted to leave, taking his child with him. Hall's vehicle was parked on the street in front of Sister's home. When Sister saw Hall attempting to leave in his car, she tried to get Hall to stay because she was concerned over his level of intoxication. Hall became upset because he wanted to leave. Sister then suggested Hall just leave his child. Hall "began like getting really mad and yelling" and "not making sense." Tr. Vol. II at 66. Hall put his child in the car seat in the back of the car, but Sister removed the child when Hall walked to the driver side of the vehicle. Sister testified that Hall then came around from the driver side with a gun, pointing it at her, and demanded she return his son to him. Sister returned the child to Hall and walked away, going inside her home.

[5] Mendez came out of the house and asked Hall to talk. Hall and Mendez spoke in the front yard, where it was dark. A witness testified that Hall became "angry" while he and Mendez spoke. Tr. Vol. II at 92. The witness further

testified that Hall "must have said something to [Mendez] because [Mendez] was pulling up his pants like they were gonna fight." *Id.* Hall testified that he had confronted Mendez about Sister's black eye and heard Mendez say something like "kill you." Tr. Vol. III at 78. Hall further testified that he saw Mendez grab something, and then Mendez swung at him, after which Hall felt a "sting" on his finger. *Id.* at 79. Hall said he tried to back away, but Mendez swung at him a second time, after which Hall felt a sting on his finger again. Hall believed Mendez had a knife. He testified that he was afraid of Mendez, it was dark enough he could barely see Mendez, Mendez was a gang member, and Mendez had told Hall he stored guns at someone else's house and had previously shot someone.

[6] Hall said he felt like Mendez was going to kill him, so Hall grabbed the gun he had behind his waist, pulled the slide back to load a round in the chamber, and fired at Mendez. Hall said Mendez was still coming toward him, so he "panicked" and "kept shooting." Tr. Vol. III at 80. However, witnesses who were present at the time testified that Hall fired once at Mendez and missed; fired a second time, causing Mendez to fall; and then walked around Mendez and emptied the clip into Mendez's body. Another witness testified that Hall said, "I shot him." Tr. Vol. II at 205. Hall then got in his car with his son and left the scene. More than one witness called 911. Hall shot at Mendez eighteen times, and Mendez died from the multiple gunshot wounds he received.

[7] After leaving Sister's house, Hall drove through Fort Wayne, making several turns. He saw headlights in his rearview mirror and believed he was being

chased. A law enforcement officer located Hall and began pursuit. Former Detective Everett White[2] observed Hall increase his speed, drive on the wrong side of the road, drive through yards, strike a parked car in a driveway, drive through a red light, and strike vehicles at Larry's Auto Sales when Hall was unable to negotiate a turn. When Hall ultimately stopped, his car was no longer drivable. Hall's two-year-old child was in the car throughout the pursuit.

[8]     Meanwhile, back at Sister and Mendez's home, law enforcement officers "searched [the yard] extremely carefully on multiple occasions" but "[t]here were no weapons of any kind recovered from the area of the yard" around Mendez's body. Tr. Vol. III at 56. In other words, the knife Hall claimed that Mendez used against him was not recovered. Additionally, Hall did not have any "marks, bruises, cuts, or welts" on his hands. Tr. Vol. II at 205. There was nothing that corroborated Hall's claim that he felt "stings" on his fingers.

[9]     The State charged Hall with murder;[3] pointing a firearm as a Level 6 felony;[4] criminal recklessness as a Level 6 felony;[5] resisting law enforcement as a Level

---

[2] Sometime before trial, Detective White changed his name to Diesel Black. Detective White left his job at the Fort Wayne Police Department before the trial.

[3] Ind. Code § 35-42-1-1.

[4] *Id.* § 35-47-4-3.

[5] *Id.* § 35-42-2-2.

6 felony;[6] and neglect of a dependent as a Level 6 felony.[7] The State also filed an information seeking an enhanced sentence for use of a firearm.[8]

[10] At trial, Sister testified that she had gone back inside her home after her attempt to keep Hall from leaving, and then she heard Hall yelling "look at my sister[']s face, that's why she has a black eye," Tr. Vol. II at 72. Sister also testified she did not hear Mendez speaking with Hall before she heard gunshots and denied that she had told Mendez that Hall had pointed a gun at her. Hall's attorney attempted to use the testimony of Detective Brent Roddy of the City of Fort Wayne Detective Bureau to impeach Sister's testimony:

> Q: Detective, in your conversation with [Sister] she discussed [Hall] pointed a gun at her, correct?
>
> A: Correct.
>
> Q: And she told you that after [Hall] pointed the gun at her, she ran in the house, correct?
>
> A: That's what she told me, yes.

---

[6] *Id.* § 35-44.1-3-1.

[7] *Id.* § 35-46-1-4.

[8] *Id.* § 35-50-2-11.

Q: And [Sister] then told you that after she ran in the house she told [Mendez] that [Hall] pointed a gun at her and was really drunk, correct?

A: That's what she told me.

Q: [Sister] also told you that [Mendez] then ran out to confront [Hall], correct?

Tr. Vol. III at 62–63.

[11] At this point, the State objected on hearsay grounds. When Hall's attorney argued that he was attempting to impeach [Sister's] testimony, the State replied that the impeachment was already complete so any answer to the last question posed would be hearsay because the defense had not asked Sister about the same issue (Mendez running out to confront Hall) when she had previously testified. The trial court struck the last question quoted above.

[12] A jury convicted Hall on all counts except the charge of pointing a firearm and found the evidence was sufficient to support the firearm enhancement. On November 18, 2022, the trial court sentenced Hall as follows: 55 years for murder and 2 years for criminal recklessness, to be served consecutively; 2 years for resisting law enforcement and 2 years for neglect of a dependent, to be served concurrently to each other and consecutively to the sentences for murder and criminal recklessness; and 15 years on the enhancement for using a firearm in the commission of an offense. In total, the trial court imposed an aggregate

74-year executed sentence to the Indiana Department of Correction. Hall now appeals his convictions and sentence.

## Discussion and Decision

### *1. The Trial Court Did Not Prevent Hall from Impeaching a Witness*

[13] Hall contends that the trial court erred when it refused to allow him to fully impeach Sister's testimony through the testimony of Detective Roddy. "'Impeachment' is defined as '[t]he act of discrediting a witness, as *by catching the witness in a lie* or by demonstrating that the witness has been convicted of a criminal offense.'" *Taylor v. State*, 840 N.E.2d 324, 330 n.1 (Ind. 2007) (emphasis in original) (quoting Black's Law Dictionary 768 (8th ed. 2004)). The Indiana Rules of Evidence allow the impeachment of a witness, *see* Ind. Evidence Rule 607, including through the use of extrinsic evidence, *see Id.* 613

[14] "Trial courts may consider a variety of relevant factors in making the determination to admit or exclude extrinsic evidence" under Evidence Rule 613, such as "the availability of the witness, the potential prejudice that may arise from recalling a witness only for impeachment purposes, the significance afforded to the credibility of the witness who is being impeached, and any other factors that are relevant to the interests of justice." *Hall*, 177 N.E.3d at 1195–96 (citing *Griffith*, 31 N.E.3d at 973). "We review a trial court's decision to exclude evidence for an abuse of discretion, which occurs when the court misinterprets the law." *Hayko v. State*, 211 N.E.3d 483, 488 (Ind. 2023). However, any error in the admission or exclusion of evidence is harmless

"when it results in no prejudice to the 'substantial rights' of a party." *Hall*, 177 N.E.3d at 1197 (quoting *Durden v. State*, 99 N.E.3d 645, 652 (Ind. 2018)).

[15] Hall argues that the trial court prevented him from fully impeaching Sister, a "key witness with a material prior inconsistent statement." Appellant's Br. at 10. Specifically, he contends that he elicited testimony from Detective Roddy to impeach Sister's testimony that, after attempting to stop Hall from leaving with Hall's child, she had neither seen Mendez in the house nor told Mendez that Hall had pointed a gun at her. However, Hall asserts the trial court was "in error" when it refused to allow Detective Roddy to testify further to impeach Sister's testimony by eliciting testimony that she had told Detective Roddy she had seen Mendez leave the house to "confront" Hall. Appellant's Br. at 13. Hall further argues that the error was not harmless because the State relied on Sister's testimony for the sequence of events and to "refute Hall's claims that Mendez was a gang member, had guns, and had previously shot someone." *Id.* at 14.

[16] The trial court correctly determined that Hall had completed the impeachment of Sister's testimony before his attorney asked Detective Roddy whether Sister had told him that Mendez had left the house to confront Hall. Hall's counsel asked Sister on cross-examination whether she had seen Mendez in the house after Hall had pointed the gun at her and whether she had told Mendez that Hall had pointed a gun at her. Sister answered both questions in the negative. Hall's counsel later elicited testimony from Detective Roddy that Sister had told him during the investigation of the shooting that she had seen Mendez in the

house after Hall had pointed the gun at her and that she had informed Mendez of the gun incident. At this point, the impeachment of Sister was complete because Detective Roddy's testimony about Sister's statements during the investigation directly contradicted her trial testimony. *See Taylor*, 840 N.E.2d at 330 n.1 (quoting Black's Law Dictionary 768). Therefore, the trial court did not abuse its discretion when it sustained the State's objection to Hall's additional question asking Detective Roddy whether Sister had reported to him that Mendez had then gone outside to confront Hall.

### 2. *Hall Has Not Shown Error Regarding His Self-Defense Claim*

[17]     Hall next contends that the State failed to rebut his claim of self-defense. Our Supreme Court has described the law on self-defense as follows:

> A defendant can raise self-defense as a justification for an otherwise criminal act. I.C. § 35-41-3-2; *Miller [v. State]*, 720 N.E.2d [696,] 699 [(Ind. 1999)]. When self-defense is asserted, the defendant must prove [1] he was in a place where he had a right to be, [2] "acted without fault," and [3] reasonably feared or apprehended death or great bodily harm. *Miller*, 720 N.E.2d at 699–700. The State must then negate at least one element beyond a reasonable doubt "by rebutting the defense directly, by affirmatively showing the defendant did not act in self-defense, or by simply relying upon the sufficiency of its evidence in chief." *Lilly v. State*, 506 N.E.2d 23, 24 (Ind. 1987). We will reverse a conviction only if no reasonable person could say the State overcame the self-defense claim beyond a reasonable doubt. *Id.*

*Larkin v. State*, 173 N.E.3d 662, 670 (Ind. 2021). Indiana Code section 35-41-3-2(c) describes the allowable use of force to protect one's person or property:

A person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force. However, a person:

(1) is justified in using deadly force; and

(2) does not have a duty to retreat;

if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony. No person, employer, or estate of a person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary.

"The amount of force that an individual may use to protect himself must be proportionate to the urgency of the situation. When a person uses more force than is reasonably necessary under the circumstances, the right of self-defense is extinguished." *Pinkston v. State*, 821 N.E.2d 830, 842 (Ind. Ct. App. 2004) (citing *Hollowell v. State*, 707 N.E.2d 1014, 1021 (Ind. Ct. App. 1999)), *trans. denied*.

[18] When considering a claim of self-defense, it is "within the province of the jury to weigh the evidence and assess witness credibility in arriving at its verdict." *Brantley v. State*, 91 N.E.3d 566, 576 (Ind. 2018) (citing *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016)).

When a defendant alleges the State did not sufficiently rebut his self-defense claim, we do not reweigh evidence or assess witness

credibility, and only look "to the evidence most favorable to the judgment." *Miller v. State*, 720 N.E.2d 696, 699 (Ind. 1999). "[W]here such evidence and reasonable inferences constitute substantial evidence of probative value sufficient to support the judgment," we affirm. *Id.*

*Larkin*, 173 N.E.3d at 667 (alteration in original).

[19] Hall's argument on appeal assumes that he met the requirements to assert a claim of self-defense. Hall concentrates solely on whether he had a reasonable fear of death or great bodily injury. In support of his reasonable-belief argument, Hall relies on testimony from others who were nearby immediately before and at the time of the shooting. Specifically, Hall cites testimony that a neighbor heard Mendez in a "conflict immediately prior to the gun shots." Appellant's Br. at 16 (citing Tr. Vol. II at 132). He further points to another witness's testimony that "Mendez was pulling up his pants like they were gonna fight," Tr. Vol. II at 92, and Mendez had given his phone to a bystander, *id.* at 96. There was also testimony that Mendez "swung" at Hall. *Id.* at 92.

[20] Even assuming for the sake of argument that Hall demonstrated all three elements necessary to claim self-defense, we conclude that he has not demonstrated that his response was proportionate to the perceived threat. The evidence regarding Hall's altercation with Mendez is telling. Hall briefly acknowledges that his self-defense argument was based on his belief that Mendez had been swinging a knife at him, but no knife was found at the scene. On appeal, Hall attempts to explain the lack of a knife being found at the scene by stating that the scene was not secure immediately after the shooting.

However, the jury heard Hall's testimony that he believed Mendez had swung a knife at him but clearly rejected Hall's self-defense claim because it found him guilty of murder. Hall's self-defense appellate argument amounts to a request that we reweigh the evidence, which we cannot do. *See Larkin*, 173 N.E.3d at 667 (citing *Miller*, 720 N.E.2d at 699). There was substantial evidence of probative value that at the time Hall shot Mendez he was not defending himself in a proportionate manner. Hall has not shown error regarding his claim of self-defense.

### 3. Hall's Sentence Is Not Inappropriate under Indiana Appellate Rule 7(B)

[21] Finally, Hall contends his sentence is inappropriate in light of the nature of the offenses and his character. The Indiana Constitution authorizes us to independently review and revise a trial court's sentencing decision. *Faith v. State*, 131 N.E.3d 158, 159 (Ind. 2019) (citing Ind. Const. art. 7, §§ 4, 6; *McCain v. State*, 88 N.E.3d 1066, 1067 (Ind. 2018)). That authority is implemented through Appellate Rule 7(B), which permits us to revise a sentence if, after due consideration of the trial court's decision, we find that the sentence is "inappropriate in light of the nature of the offense and the character of the offender." *Faith*, 131 N.E.3d at 159 (quoting Ind. Appellate Rule 7(B)).

[22] Our role under Appellate Rule 7(B) is to "leaven the outliers," *Faith*, 131 N.E.3d at 159–60 (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008)), and we reserve that authority for "exceptional cases," *Mullins v. State*, 148 N.E.3d 986, 987 (Ind. 2020) (quoting *Faith*, 131 N.E.3d at 160). When gauging inappropriateness under Appellate Rule 7(B), we "focus on the forest—

the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count. *Brown v. State*, 10 N.E.3d 1, 8 (Ind. 2014) (citing *Cardwell*, 895 N.E.2d at 1225). Thus, we consider a variety of sentencing tools, such as probation and home detention, in our Appellate Rule 7(B) analysis. *Davidson v. State*, 926 N.E.2d 1023, 1025 (Ind. 2010). Generally, a trial court's sentencing decision prevails unless it is "overcome by compelling evidence portraying in a positive light the nature of the offense . . . and the defendant's character." *Stephenson v. State*, 29 N.E.3d 111, 111–12 (Ind. 2015). In conducting this analysis, "we are not limited to the mitigators and aggravators found by the trial court." *Brown*, 10 N.E.3d at 4.

[23] When considering the nature of the offense, we start with the advisory sentence to determine the appropriateness of the sentence. *Brown*, 10 N.E.3d at 4 (citing *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007)). Hall was convicted of and sentenced for murder, criminal recklessness as a Level 6 felony, resisting law enforcement as a Level 6 felony, neglect of a dependent as a Level 6 felony, and a firearm enhancement. The trial court imposed the advisory sentence for murder, 55 years;[9] two years on each of the Level 6 felonies, for which one year

---

[9] I.C. § 35-50-2-3.

is the advisory sentence;[10] and 15 years for the firearm enhancement, for which courts may enhance a sentence between 5 and 20 years.[11]

[24] "Generally, 'it is within the trial court's discretion whether to order sentences to be served concurrently or consecutively.'" *Fix v. State*, 186 N.E.3d 1134, 1143 (Ind. 2022) (quoting *Myers v. State*, 27 N.E.3d 1069, 1082 (Ind. 2015)). In addition, an offense involving multiple victims "is highly relevant to the decision to impose consecutive sentences." *Myers v. State*, 27 N.E.3d 1069, 1082 (Ind. 2015). An enhancement for use of a firearm under Indiana Code § 35-50-2-11 must be served consecutively. I.C. § 35-50-1-2(f).

[25] Hall first contends that his sentence is inappropriate given the nature of the offenses. The trial court imposed an aggregate sentence of 74 years executed. Hall argues that his 74-year total sentence is an outlier considering the nature of the offense. Specifically, he contends the trial court erred by "conflating the standard for self-defense with the standard for finding as a mitigating factor that the victim induced the offense." Appellant's Br. at 19. However, in his single-paragraph analysis, Hall cites no law in support of his argument that this was error. The failure to support an argument on appeal with citation to relevant authority can result in waiver of the issue. App. R. 46(A)(8)(a). Nevertheless, we address Hall's argument on the merits.

---

[10] *Id.* § 35-50-2-7.

[11] *Id.* § 35-50-2-11.

[26] We are not persuaded that Hall's sentence is inappropriate in light of the nature of the offenses. After drinking to the point of falling-down intoxication, Hall engaged in an altercation with Mendez; shot Mendez, who fell to the ground; and then unloaded his clip into the fallen Mendez. A later law enforcement search found no weapons in the yard around Mendez's body. Hall fled the scene with his toddler in the car, leading law enforcement officers on a chase through Fort Wayne. Despite pursuit by law enforcement, Hall increased his speed, drove on the wrong side of the road, drove through yards, struck a parked car in a driveway, drove through a red light, and struck vehicles in a car sales lot when he was unable to negotiate a turn. When law enforcement officers apprehended Hall, his car was no longer drivable. On these facts, Hall has not demonstrated that his 74-year aggregate sentence for murder, criminal recklessness, resisting law enforcement, and neglect of a dependent, including a 15-year firearm enhancement, is inappropriate in light of the offenses.

[27] Hall also contends that his sentence is inappropriate considering his character. In support, he argues that he is only 29 years old, has no adult criminal history, timely completed probation in a juvenile matter but was never adjudicated a delinquent, has a young son, reports having a good relationship with his family, has demonstrated a good work history, and scored as low risk to reoffend on the Indiana Risk Assessment System evaluation. He also notes the letters of support filed prior to his sentencing, which describe him as "always there to help when needed," having a "happy spirit despite the odds against him," friendly, and respectful. Appellant's Br. at 20.

While this is Hall's first criminal conviction, and he has otherwise led a law-abiding life, the positive aspects of his character do not outweigh the severity of the offense he committed. Additionally, Hall's evidence of good character does not establish much more than he has simply not committed crimes in the past. There is nothing in his past that shows he has been a positive influence on his community, his friends, or even his family. Finally, Hall's conduct on the night of the offense endangered other partygoers who witnessed the shooting; anyone on Fort Wayne streets while he was fleeing from law enforcement officers; and even his young son, who was in the vehicle during the car chase. Hall's actions leading up to the shooting reflect poorly on his character, namely, going to a children's party with a loaded firearm, getting falling-down drunk, and choosing to drive with his toddler in the vehicle despite Sister's intervention to protect the toddler. Despite Hall's otherwise clean record and family support, Hall has not demonstrated that his character mitigates the severity of the offense to an extent that demonstrates his aggregate sentence is inappropriate.

## Conclusion

The trial did not court err when it prevented an additional question Hall asked of a witness to impeach Sister's testimony. Hall also has not shown error regarding his claim of self-defense. Finally, Hall's sentence is not inappropriate in light of the nature of the offenses and his character. Therefore, we affirm Hall's convictions and sentences.

Affirmed.

Pyle, J., and Kenworthy, J., concur.

ATTORNEY FOR APPELLANT

Aaron J. Stoll
The Law Office of Aaron J. Stoll, LLC
Fort Wayne, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Catherine E. Brizzi
Deputy Attorney General
Indianapolis, Indiana